# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4528 | **DATE** | 1/30/2003 |
| **CASE TITLE** | SOUTH INDUSTRIAL LEASING, LLC vs. INGERSOLL-RAND COMPANY | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Status hearing held and continued to 2/20/03 at 9:00 a.m. Steven J. Rosenberg's motion to appear as lead counsel for plaintiff is granted. Enter Memorandum Opinion And Order. Defendant's motion to dismiss is granted in part and denied in part. If commencement of this action for breach of the sublease is not ratified by the real party in interest within twenty-one days of the date of this order, Counts IV and V shall be dismissed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | JAN | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SOUTH INDUSTRIAL LEASING, LLC, )
an Illinois limited liability company, )
                                       )     Case No. 02 C 4528     **DOCKETED**
       Plaintiff,             )
                                         )     Hon. John W. Darrah     **JAN 3 1 2003**
       v.                    )
                                         )
INGERSOLL-RAND COMPANY,     )
a New Jersey corporation,        )
                                         )
       Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff, South Industrial Leasing, LLC ("South Industrial"), filed a five-count complaint against Defendant, Ingersoll-Rand Company ("Ingersoll-Rand"), alleging breach of contract (Counts I and II), fraudulent misrepresentation (Count III), and breach of the sublease (Counts IV and V). Ingersoll-Rand moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint for failing to state a claim upon which relief can be granted.

For the reasons that follow, Ingersoll-Rand's Motion to Dismiss is denied in part and granted in part.

## LEGAL STANDARD

When considering a motion to dismiss, the district court must review the complaint liberally, taking as true all well-pleaded allegations and the inferences that may be drawn from them. *See Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999). Any ambiguities in the complaint are construed in favor of the plaintiff. *Kelly v. Crosfield Catalysts*, 135 F.3d 1202, 1205 (7th Cir. 1998). Dismissal is proper only when it appears beyond doubt that Plaintiff can prove no set of facts to

-1-



support the allegations in his or her claim. *Strasburger v. Board of Education*, 143 F.3d 351, 359 (7th Cir. 1998).

"Although the Federal Rules of Civil Procedure do not require a plaintiff 'to set out in detail the facts upon which he bases his claim,' . . . he must 'set out sufficient factual matter to outline the elements of his cause of action or claim, proof of which is essential to his recovery.'" *Benson v. Cady*, 761 F.2d 335, 338 (7th Cir. 1985) (internal citation omitted). A complaint will not avoid dismissal if it contains "bare legal conclusions" absent facts outlining the basis of the claims. *Perkins v. Silverstein*, 939 F.2d 463, 467 (7th Cir. 1991).

## BACKGROUND

For purposes of this Motion to Dismiss, the following allegations are taken as true.

South Industrial is a Delaware limited liability company with its principal offices in Illinois. South Industrial is the successor of Roger J. Platt and Elmhurst Property, LLC, a Delaware limited liability company. South Industrial is the assignee of the claims from RJP Elmhurst Properties, LLC, a Delaware limited liability company. Ingersoll-Rand is a New Jersey corporation with its principal offices in North Carolina.

This action involves Ingersoll-Rand's sale and lease of real property located at 888 Industrial Drive, Elmhurst, Illinois ("the premises"). Prior to 1967, the premises were undeveloped and used for farming. In 1967, a building was constructed on the premises. Northwest National Bank of Chicago Trust No. 189 ("the trust") was the owner of the premises and the building. Ingersoll-Rand was the first occupant of the building, leasing it from the trust for a term that began on November 10, 1967 and ended August 3, 1987. During this time, no other tenant occupied the building. On or about August 3, 1987, Ingersoll-Rand purchased the premises from the trust. After

it purchased the premises, Ingersoll-Rand continued to be the sole occupant of the building.

During its occupancy, Ingersoll-Rand sold, rented, and repaired air compressors and ancillary air power equipment within the building. Ingersoll-Rand also owned and operated an electrical transformer within the building for some portion of its thirty-four-year occupancy of the building. However, this transformer was removed prior to August 2000.

At some point during Ingersoll-Rand's occupancy of the building, the building became contaminated with polychlorinated biphenyls or PCBs. PCBs are a mixture of synthetic organic chemicals. The United States Environmental Protection Agency ("the EPA") has determined that PCBs are probably carcinogenic to humans. PCBs have significant health effects, including cancer, neurotoxicity, reproductive and developmental toxicity, immune system suppression, liver damage, skin irritation, and endocrine disruption.

PCBs were used in industrial and commercial applications, including electrical and hydraulic equipment, pesticides, plasticizers, rubber products, pigments, dyes, and carbonless copy paper. PCBs were also used as a dielectric fluid in electrical equipment, such as transformers and capacitors, as well as hydraulic and heat transfer systems. PCBs were also used as a synthetic lubricant in air compressors. By Act of Congress, production of PCBs ceased in 1977, although their use and distribution were permitted in a manner prescribed by the EPA.

The PCB contamination occurred as a result of Ingersoll-Rand's repair and service of air compressors and other equipment containing PCBs, spills and releases of PCBs from an electrical transformer used by Ingersoll-Rand, and/or other activities by Ingersoll-Rand. Ingersoll-Rand took no steps or inadequate steps to clean up the PCB contamination but, instead, allowed PCBs to remain in and contaminate the buildings surfaces, sewers, and sumps. Ingersoll-Rand did not report to the

EPA or any other regulatory agency the release of PCBs.

In 2000, Robert J. Platt ("Platt") began negotiations with Ingersoll-Rand for the purchase of the premises. Ingersoll-Rand did not inform Platt of its PCB use or of PCB contamination. On or about August 25, 2000, Platt and Ingersoll-Rand entered into a real estate sales contract ("the Sales Contract") under which Platt agreed to purchase the premises for $2,800,000. In a rider to the Sales Contract ("the rider"), Ingersoll-Rand made certain representations and warranties as to environmental conditions at the premises. Specifically, Ingersoll-Rand represented that it:

> has previously complied, and is currently complying in all respects, with all federal, state and local statutes, laws, ordinances, orders, rules, regulations and moratoria relating to its operations at or its occupancy of the Property, including, but not limited to, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the Safe Drinking Water Act, as amended, the Resource Conservation and Recovery Act, as amended ("RCRA"), the Toxic Substances Control Act, as amended, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Material Transportation Act, as amended, and the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"). Seller has not received any notice alleging any non-compliance with or potential liability pursuant to any of such statutes, ordinances, orders, rules, regulations or moratoria[.]

(Compl. Ex. 2 R-4(a)(ii).) Ingersoll-Rand also represented that the premises "(including land, surface water, ground water, if any) is (sic) free" of all contamination. (Compl. Ex. 2 R-4(a)(iii)).

As a condition precedent to purchase, Ingersoll-Rand was required to provide a "Phase I Environmental Survey". Ingersoll-Rand also promised to deliver to Platt "all engineering plans, studies, tests and other documents previously prepared by or at [its] direction . . . with respect to" the premises, including all environmental audits or assessments or occupational health studies. Ingersoll-Rand and Platt agreed that, at closing, Ingersoll-Rand would enter into a six-month triple-net lease of the premises.

-4-

Ingersoll-Rand hired Capsule Environment ("Capsule") to perform the environmental survey ("the Capsule survey") of the premises. On September 8, 2000, Capsule inspected the premises and interviewed Mark Greer ("Greer"), the facility service manager; Joseph Fumo, the facility manager; and Jay Welu ("Welu"), branch manager, whom Ingersoll-Rand identified as knowledgeable about the building's use and condition. Greer, Fumo and Welu did not tell Capsule that Ingersoll-Rand used PCBs or handled equipment containing PCBs; that building surfaces, sewers, and sumps were contaminated with PCBs; or that PCBs had been released in the building. Capsule presented the Phase I Report to Ingersoll-Rand on September 14, 2000, which did not contain discussion, assessment, or analysis concerning PCBs. The Phase I Report was delivered to Platt prior to closing.

On August 28, 2000, Platt retained Mostardi-Platt Associates, Inc. ("MPA") to perform a Phase I environmental survey of the premises.

On August 27, 2000, MPA conducted a limited soil investigation of the premises that further assessed two recognized environmental conditions identified by its Phase I environmental survey, an oil-stained sump and a former petroleum underground storage tank. MPA took two soil samples from below the building's concrete floor near the sump and former underground storage tank. It analyzed the soil for a number of chemicals, including PCBs, and found no PCBs or other chemicals of significance.

On August 30, 2000, MPA also inspected the premises for potential recognized environmental conditions, including sources of PCBs such as electrical transformers, fluorescent light ballasts, electrical capacitors, and hydraulic lifts. MPA identified the presence of three pole-mounted electrical transformers on the south side of the exterior of the building. These transformers were owned by Commonwealth Edison and were in good condition with no visible leaks or

irregularities and reportedly free of PCBs. MPA found no electrical capacitors or hydraulic lifts in the building. MPA also found fluorescent light ballasts that were in good condition with no evidence of leaks.

MPA interviewed Welu and Fumo regarding the current and past use of the premises, the facility operations, and recent improvements to the premises. Neither Welu nor Fumo told MPA of Ingersoll-Rand's use of PCBs; that building surfaces, sewers, and sumps were contaminated with PCBs; or that PCBs had been released in the building. In fact, Welu and Fumo stated that Ingersoll-Rand had never used or handled PCBs or any other hazardous materials on the premises. Fumo assured Platt that audits performed regularly by Ingersoll-Rand's in-house personnel and outside consultants showed that PCBs were never used or handled on the premises.

Platt assigned all of his rights, title, and interest in and to the Sales Contract to an exchange intermediary, Investment Advantage Group ("IAG"), through a Purchase, Lease and Like-Kind Exchange Agreement ("Exchange Agreement") signed on September 26, 2000. IAG assigned its rights in the Sales Contract to Elmhurst Property, LLC, a Delaware limited liability company of which IAG was the sole member.

On or about September 26, 2000, Ingersoll-Rand sold the premises to Elmhurst Property by warranty deed. On or about September 27, 2000, Elmhurst Property entered into a seven-year lease of the premises with RJP Elmhurst Properties, LLC ("RJP"), a Delaware limited liability company of which Platt was president and sole member.

On September 27, 2000, RJP and Ingersoll entered into a non-renewable sublease of the premises. The sublease expired on March 31, 2001. The sublease could be terminated earlier if Ingersoll-Rand provided thirty-days' written notice of termination. Pursuant to the sublease,

Ingersoll-Rand agreed not to "commit, or suffer to be committed, any annoyance, waste, nuisance, act or thing against public policy." (Compl. Ex. 4 ¶ 6.) Ingersoll-Rand also agreed to indemnify RJP for "any liability arising from [Ingersoll-Rand's] violation of any environmental, health or safety law, regulation or ordinance." (Compl. Ex. 4 ¶ 14(b).) The sublease also provided that:

> [u]pon the Expiration Date or upon the termination of [Ingersoll-Rand's] right of possession, whether by lapse of time or at [Ingersoll-Rand's] option . . . [Ingersoll-Rand] shall (i) immediately surrender the [p]remises to [RJP] in the same condition as existed on August 25, 2000, ordinary wear and tear excepted and (ii) remove all items of personal property from the [b]uilding and [p]remises.

(Compl. Ex. 4 ¶ 19(a).) Under the sublease, if Ingersoll-Rand did not immediately surrender the premises on the Expiration Date or upon sublease termination, it was required to:

> (i) pay to [RJP] on demand for all liability, obligation, claim, loss, cost, actual or consequences [sic] damages, interest, expenses (including, without limitations all legal fees and expenses) arising from or relating to, directly or indirectly, such failure to surrender the [p]remises and (ii) indemnify and defend [RJP] against all liability, obligation, claim, loss, cost, actual or consequences [sic] damages, interest, expenses . . . arising from or relating to, directly or indirectly, such failure to surrender the [p]remises.

(Compl. Ex. 4 ¶ 19(c).) Ingersoll-Rand continued its uninterrupted occupancy of the building and remained its sole and exclusive occupant.

On February 14, 2001, Ingersoll gave written notice to RJP of its intent to terminate its tenancy effective March 17, 2001. After February 14, 2001 but before March 17, 2001, Platt and RJP learned that the building was contaminated with PCBs. RJP asked Ingersoll-Rand to clean up the contamination, but Ingersoll-Rand refused. Ingersoll-Rand failed to pay the rent and taxes due for the period from March 1 to March 17, 2001, and never provided the keys to the building to RJP, limiting RJP's access to the building.

On March 21, 2001, Elmhurst Property transferred all of its interests in the premises to South

Industrial by special warranty deed. About the same time, Elmhurst Property transferred all of its interests in the lease to South Industrial.

During the period of the sublease, RJP and/or South Industrial identified GE Power Systems ("GE") as a prospective tenant for the premises after the expiration of Ingersoll-Rand's sublease. GE hired Earth Tech, Inc. ("Earth Tech") to perform a limited scope environmental site assessment of the premises, as required by GE's pre-lease due diligence policy. GE asked Earth Tech to sample and test sediment, soil borings, surface wipes, and water for a list of chemicals, including PCBs. Earth Tech took samples on February 21 and 22, 2001. Earth Tech found PCBs on building surfaces and in a sewer drain on the premises above remedial objectives established by the Illinois Environmental Protection Agency ("IEPA").

GE told RJP of the PCB contamination and that it would not lease the premises because of the PCB contamination. After receiving this information, RJP hired MPA to confirm the presence of PCBs. From February 28 through March 31, 2001, MPA collected samples from building surfaces, drains, sumps and other areas of the building. Tests at Great Lakes Analytical showed that each of the areas was contaminated with PCBs. Samples from building surfaces exceeded cleanup standards established by the EPA and the IEPA.

In a letter dated March 8, 2001, Platt informed Ingersoll-Rand that, under Section 19(a)(ii) of the sublease, unless "all debris, garbage, and hazardous materials, wastes and residues" were removed from the premises, RJP would consider Ingersoll-Rand to be a holdover tenant. In a letter dated March 9, 2001, counsel for RJP informed Ingersoll-Rand of the detection of PCB contamination on the premises and requested that Ingersoll-Rand "take all appropriate steps necessary to assess and remedy this problem by the expiration of the sublease." (Compl. Ex. 9.)

On March 14, 2001, Platt spoke with Gerald Moran ("Moran"), Ingersoll-Rand's Assistant General Counsel, regarding the PCB contamination. In a letter dated March 15, 2001, Moran stated that: Ingersoll-Rand "question[ed] [RJP's] motivation for taking wipe samples for PCBs"; "Ingersoll-Rand had no knowledge, actual or constructive, that there could have been PCB contamination" on the premises; "Ingersoll-Rand would not have been obligated to clean up the PCBs in [the warehouse] based on [its] use of such area"; and Ingersoll-Rand was not holding over as a result of personal property remaining on the premises because Section 19(a) of the sublease provided that RJP's remedy for failure to remove personal property was RJP gained title to the property or RJP could store, destroy or otherwise dispose of such property at Ingersoll-Rand's expense. (Compl. Ex. 10.) The March 15, 2001 letter also stated that Ingersoll-Rand's notice of termination of the sublease was timely.

In a letter dated March 16, 2001, counsel for RJP asked Ingersoll-Rand to clean up the contamination. Ingersoll-Rand did not clean up the PCB contamination by March 17, 2001.

In a letter dated March 26, 2001, counsel for RJP notified Ingersoll-Rand that it believed that Ingersoll-Rand was unlawfully possessing the property as a holdover tenant due to the PCB contamination; the premises were "found damaged, rendered unsuitable for occupancy and not in good repair" due to the PCB contamination; and the contamination caused a long-term lease for the property to fall through.

During the ensuing correspondence that developed between counsel for Ingersoll-Rand and RJP, Ingersoll-Rand took the position that RJP's discovery of PCB contamination was an attempt to renegotiate the purchase price of the premises and to obtain money from Ingersoll-Rand to convert the premises into office space. Ingersoll-Rand also expressed doubt as to the veracity of the

environmental surveys conducted by companies owned by RJP or Platt.

In April 2001, RJP hired Keter Environmental ("Keter"), a certified, independent third party to conduct PCB sampling. Keter took wipe samples in the warehouse and loading dock of the building. Keter found PCB levels on building surfaces and a sludge sample that exceeded EPA standards.

In a letter dated April 27, 2001, counsel for RJP asked Ingersoll-Rand to clean up the PCB contamination. In a letter dated May 2, 2001, counsel for Ingersoll-Rand stated that there was no evidence that Ingersoll-Rand had caused the PCB contamination. Ingersoll-Rand continued to deny that it had caused the PCB contamination even after discussions between executives at Ingersoll-Rand and RJP.

On March 21, 2001, Elmhurst Property conveyed the premises to South Industrial. South Industrial then hired Keter to assess and oversee the clean up of the building. Due to the extent of the PCB contamination, Keter had to hire Thomas Madden Construction ("Madden") to remove the contaminated concrete floors and drains in July and August 2001. Madden also disconnected and closed some drains. Madden replaced the floors and drains in September 2001.

In August 2001, RJP and South Industrial informed Ingersoll-Rand of the wastes generated by the clean up and asked Ingersoll-Rand to arrange for disposal of those wastes. Ingersoll-Rand refused.

## DISCUSSION

Ingersoll-Rand argues that dismissal is appropriate because South Industrial's breach of contract claim is barred by the merger doctrine.

"In general, if the terms of a contract for the sale of real estate are fulfilled by the delivery

of the deed, there is a merger of the two instruments and, unless a reservation is made in the deed, [the deed] supersedes all contract provisions." *Lanterman v. Edwards*, 294 Ill. App. 3d 351, 353 (1998). "A notable exception [to the merger doctrine] . . . is that when the contract for the sale of real estate contains provisions that are not fulfilled by delivery of the deed, the contract is not merged as to such provisions, but remains open for performance of such terms." *Neppl v. Murphy*, 316 Ill. App. 3d 581, 585 (2000). In determining whether and to what extent the contract merged into the deed, a court will look at the intention of the parties and the surrounding circumstances. *Krajcir v. Egidi*, 305 Ill. App. 3d 613, 623 (1999).

Courts should look first at the nature of the warranty contained in the contract. *Neppl*, 316 Ill. App. 3d at 587. Pursuant to the Sales Contract, Ingersoll-Rand warranted, among other things, that: (1) it had complied with and was currently complying with "all federal, state and local statutes, laws, ordinances, orders, rules, regulations and moratoria" relating to its business and conduct on the premises, including the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the RCRA; the Toxic Substances Control Act, the Emergency Planning and Community Right-To-Know Act of 1986, the Hazardous Material Transportation Act, and the CERCLA; (2) it had not received any notices alleging non-compliance or potential liability pursuant to any such statute or law; (3) the premises, including land, surface water, ground water, were free of all contamination, including, among others, any hazardous waste as defined in Subtitle C of the RCRA and the CERCLA; and (4) it had no knowledge of any adverse facts relating to the physical condition of the premises, building or any part thereof which had not been specifically disclosed in writing to Elmhurst Property. (Compl. Ex. 2 ¶ R-4(ii), (iii), (iv)).

"Generally, warranties as to quality . . . touch upon aspects other than the conveyance itself

and are incidental to the main purpose of the deed, which is to transfer good title." *Lanterman*, 294 Ill. App. 3d at 353. Here, the warranties that Ingersoll-Rand made that the premises and building were free of hazardous contamination and that it was complying with federal, state, and local law governing the use of hazardous material were warranties of quality that were "collateral to and independent of the provisions in the subsequent deed." *Neppl*, 316 Ill. App. 3d at 587. Delivery of the deed did not fulfill these obligations.

"When a contract for the conveyance of land provides for performance of the 'other acts besides conveyance,' it remains in effect until such provisions have been fully performed." *Neppl*, 316 Ill. App. 3d at 587. The complaint alleges that Ingersoll-Rand repaired and serviced equipment containing PCBs on the premises and took no steps or inadequate steps to clean up PCB contamination. These allegations reasonably support the inference that Ingersoll-Rand did not perform the warranties, and the contract is not merged into the deed. Therefore, the doctrine of merger does not bar South Industrial's breach of contract claim.

Ingersoll-Rand also argues that dismissal of the breach of contract claim is appropriate because South Industrial has not pled all the elements of breach of contract. Specifically, Ingersoll-Rand argues that South Industrial has not pled that it or its predecessors complied with the terms of the Sales Contract or its rider or were excused from performing.

In order to state a breach of contract claim under Illinois law, a plaintiff must allege (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of the contract by the defendant, and (4) injury to the plaintiff as a result of the defendant's breach. *Gonzalzles v. Am. Express Credit Corp.*, 315 Ill. App. 3d 199, 206 (2000).

The Sales Contract provided that Platt's obligation to buy the premises was subject to the

-12-

performance of the following conditions precedent: (1) delivery by Ingersoll-Rand of a Phase I Environmental Survey; (2) determinations by Platt based on soil and other tests that all physical aspects and conditions of the premises and its improvements were acceptable to Platt; (3) determination by Platt, based on an environmental audit report, that the premises were in full compliance with federal, state, and local environmental laws, statutes, codes and regulations; (4) certain determinations by Platt concerning sewer and water facilities; (5) certain determinations by Platt concerning the provision of utilities; (6) determination by Platt that the premises were properly and validly zoned for use as an environmental testing and consulting business or that it was possible to obtain proper zoning from the City of Elmhurst; and (7) a determination that Platt's proposed development or modification of the premises would not violate the Illinois Endangered Species Protection Act or the Illinois Historical Preservation Act. (Compl. Ex. 2 ¶ R-2(a)(i)-(vi)).

The complaint alleges that Ingersoll-Rand delivered a Phase I environmental survey to Platt prior to closing; Platt hired MPA to perform a Phase I environmental survey of the premises, which included a limited soil investigation of the premises, inspection of the premises, and interview of Ingersoll-Rand employees; and Elmhurst Property, an assignee of Platt, purchased the premises on or about September 26, 2000. These allegations reasonably support the inference that South Industrial or its predecessors performed the conditions precedent required by the Sales Contract. Moreover, the complaint alleges that Ingersoll-Rand agreed to provide the premises free of hazardous contamination, that the premises were later found to be contaminated with PCBs, and that South Industrial was injured by the loss of a prospective tenant due to the PCB contamination. These allegations adequately state a claim for breach of contract.

Ingersoll-Rand next argues that South Industrial fails to state a claim for fraud and should

be dismissed. Specifically, Ingersoll-Rand argues that South Industrial does not plead any false statements upon which it reasonably relied.

To state a claim for fraudulent misrepresentation under Illinois law, South Industrial must allege that (1) defendant made a statement (2) of a material nature (3) which was untrue, (4) known by the person making it to be untrue, or made in culpable ignorance of its truth or falsity, (5) relied upon by South Industrial to its detriment, (6) made for the purpose of inducing reliance, and (7) South Industrial's reliance led to its injury. *Bensdorf & Johnson, Inc. v. Northern Telecom Ltd.*, 58 F. Supp. 2d 874, 881 (N.D. Ill. 1999) (citing *Doherty v. Kahn*, 682 N.E.2d 163, 167 (Ill. App. Ct. 1997)). "[T]he alleged misrepresentation must . . . relate to a past or present fact, not a future or contingent event," except where the misrepresentations are part of a "scheme to defraud". *Bensdorf & Johnson*, 58 F. Supp. 2d at 881 (citing *Razdan v. General Motors Corp.*, 979 F. Supp. 755, 759 (N.D. Ill. 1997)). To take refuge in the "scheme to defraud" exception, a plaintiff must allege, in addition to the intentional misrepresentation, "that defendant intended to induce plaintiff to act for defendant's benefit in reliance on the misrepresentation." *Bensdorf & Johnson*, 58 F. Supp. 2d at 881 (citations omitted).

A claim for fraudulent misrepresentation (Count III) must meet the pleading requirements of Rule 9(b). Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity. Fed. R. Civ. P. 9(b). This means that persons alleging fraud must state "'the who, what, when, where, and how.'" *Boyd Mach. & Repair Co. v. American Int'l Homes, Ltd.*, 100 F. Supp. 2d 898, 900 (N.D. Ill. 2000) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990)). "The allegations must be specific enough to provide the defendants with a general outline of how the alleged fraud scheme operated and of their purported role in the

scheme." *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 347 (N.D. Ill. 1997) (citations omitted).

To determine whether Count III is sufficient, a court will bear in mind the purposes of Rule 9(b): "(1) protecting the defendants' reputations; (2) preventing fishing expeditions; and (3) providing adequate notice to the defendants." *Rohlfing*, 172 F.R.D. at 347 (citing *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994)).

The complaint alleges that the PCB contamination occurred as a result of Ingersoll-Rand's repair and service equipment containing PCBs and other activities by Ingersoll-Rand; Ingersoll-Rand was the sole occupant of the building and the premises for thirty-four years; Ingersoll-Rand employees, Welu and Fumo, in interviews with MPA, stated that Ingersoll-Rand had never used or handled PCBs or any other hazardous materials on the premises; Fumo assured Platt that audits performed regularly by Ingersoll-Rand's in-house personnel and outside consultants showed that PCBs were never used or handled on the premises; and that Welu and Fumo were interviewed on August 30 and September 5, 2000, respectively. These allegations meet the "who, what, where, when and how" requirement of Rule 9(b).

Furthermore, these allegations adequately state a claim for fraudulent misrepresentation under Illinois law. The statement was material. The rider expressly gave Platt the right not to honor his obligation to purchase the premises if they were contaminated with hazardous materials like PCB. The complaint also alleges that Ingersoll-Rand repaired and serviced equipment containing PCBs on the premises. This allegation reasonably supports the inference that Welu's and Fumo's statements to MPA and Platt were untrue and known by Welu and Fumo to be untrue or made in culpable ignorance of the statements' falsity at the time they were uttered. The complaint alleges that Elmhurst Property, Platt's assignee, purchased the premises. This allegation coupled with the

-15-

fact that the rider made the duty to purchase subject to the absence of contaminants reasonably

supports the inference that Elmhurst Property relied on the statements to its detriment and that the

statements were made for the purpose of inducing reliance. The complaint also alleges that Elmhurst

Property assigned its rights in the premises to South Industrial. Finally, the allegations in the

complaint reasonably support the inference that the reliance led to South Industrial's injuries: the loss

of a prospective tenant, GE, and the cost of testing and cleaning due to the PCB contamination.

Ingersoll-Rand also moves to strike South Industrial's prayer for punitive damages because

South Industrial does not allege that Ingersoll-Rand's conduct was outrageous, willful, wanton, evil,

recklessly indifferent, or with malice.

"In order to be entitled to punitive damages, one must allege outrageous conduct, acts

perpetrated by evil motive or with reckless indifference to the rights of others. . . . Punitive damages

should not be awarded if the defendant's misconduct is not above and beyond the conduct needed

for the basis of the underlying cause of action." *Guice v. Sentinel Techs., Inc.*, 294 Ill. App. 3d 97,

110-11 (1997) (internal citations omitted). Punitive damages may also be recovered in a fraud action

"where the wrong involves some violation of duty springing from a relation of trust or confidence,

or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances

showing malice and willfulness." *Berman v. Dempsey*, 257 Ill. App. 3d 496, 501 (1994) (internal

quotation marks omitted). Whether the particular facts of a case justify the imposition of punitive

damages is a question of law. *Parsons v. Winter*, 142 Ill. App. 3d 354, 360 (1986).

The complaint contains an allegation that Ingersoll-Rand acted with "reckless indifference

to the rights of others" when it repeatedly refused to clean up the alleged PCB contamination.

Generally, "[t]he mere addition of the phrase ['reckless indifference to the rights of others'] . . . is

-16-

insufficient to allege reckless misconduct necessary to support an allowance of punitive damages." *Wait v. First Midwest Bank/Danville*, 142 Ill. App. 3d 703, 710 (1986). While the instant complaint contains this language, when the alleged conduct within the Complaint is read as a whole, in addition to the above phrase, South Industrial sufficiently pled outrageous conduct demonstrating a reckless indifference to the rights of others. Therefore, South Industrial's prayer for punitive damages in Count III is not stricken.

Finally, Ingersoll-Rand argues that South Industrial has not alleged that it is the proper party to bring a claim for breach of the sublease (Counts IV and V).

Federal Rule of Civil Procedure 17 provides that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). Ingersoll-Rand argues that South Industrial is not the proper party to sue for breach of the sublease because Elmhurst Property's assignment of the lease to South Industrial was improper under Articles 9 and 16 of the lease.

The lease is attached to the Complaint as Addendum A to Exhibit 4. Article 9 of the lease provides that:

> Tenant and Landlord may (a) assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest under it to American National Bank and Trust Company of Chicago, which Landlord hereby identifies as the Lender and (b) Tenant may sublet the Premises or any part thereof to Ingersoll-Rand Company, a New Jersey corporation and to Mostardi-Platt Associates, Inc., an Illinois corporation.

(Compl. Ex. 4, Addendum A ¶ 9.1.) Article 16 of the lease provides that:

> Each provision of this Lease shall extend to and shall bind and inure to the benefit not only of Landlord and Tenant, but also their respective heirs, legal representatives, successors and assigns, but this provision shall not operate to permit any transfer, assignment, mortgage, encumbrance, lien, charge or subletting contrary to the provisions of this Lease.

(Compl. Ex. 4, Addendum A ¶ 16.1.) Paragraph 16.3 provides that "[n]o modification, waiver or

amendment of this Lease or any of its conditions or provisions shall be binding upon Landlord unless in writing signed by Landlord." (Compl. Ex. 4, Addendum A ¶ 16.3.)

Ingersoll-Rand argues that paragraph 9.1 of Article 9 of the lease permits assignment of the lease *only* to American National Bank and Trust Company of Chicago. South Industrial argues that paragraph 9.1 permits assignment to American National Bank and Trust Company of Chicago but does not exclude any other assignments.

Breach of contract is a state law claim. Therefore, Illinois law governs. Contract interpretation is a question of law. *Diamond v. United Food & Commercial Workers Union Local 881*, 329 Ill. App. 3d 519, 524 (2002). The goal of contract construction is to determine and give effect to the parties' intent at the time of contracting. *Shields Pork Plus, Inc. v. Swiss Valley AG Serv.*, 329 Ill. App. 3d 305, 310 (2002). "If there is no ambiguity, the interpretation of the contract is a question of law to be determined solely from the terms of the contract itself," *M.H. Detrick Co. v. Century Indemnity Co.*, 299 Ill. App. 3d 620, 625 (1998), and the words are to be given their common and accepted meaning. *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 310. Whether a contract is ambiguous is a question of law. *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 311.

A contract term is ambiguous "'when the language used is susceptible to more than one meaning . . . or is obscure in meaning through indefiniteness of expression . . . .'" *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 310 (quoting *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617 (1988)). However, a disagreement between the parties as to how to interpret the contract terms does not render the terms ambiguous. *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 310.

The term "may assign" is unambiguous. The term is not susceptible to more than one meaning. The word "may" means "shall, must – used esp[ecially] in deed, contracts, and statutes."

-18-

Webster's Third International Dictionary 1396 (3d ed. 1986). Giving the terms their common and accepted meaning, "may assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest under it to American National Bank and Trust Company of Chicago" means that if Elmhurst Property chose to assign, transfer, mortgage, pledge, hypothecate or encumber the lease or any interest under the lease, it was required to assign, transfer, etc. to American National Bank and Trust Company of Chicago and no one else. Moreover, paragraph 16.1 provides that "any transfer, assignment, mortgage, encumbrance, lien, charge or subletting contrary to the provisions of this Lease" is not permitted. The assignment of the lease by Elmhurst Property to South Industrial was contrary to the provisions of the lease and, therefore, improper.

The sublease expressly provides that "[t]his sublease is expressly subject to and subordinate to the Prime Lease, and to all mortgages, deeds of trust and ground or underlying leases to which the Prime Lease is or shall be subordinate." (Compl. Ex. 4 ¶ 1(a).) Thus, South Industrial is not the proper party to bring a claim for breach of the sublease.

Rule 17 provides that "[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." Fed.R.Civ.P. 17(a). Therefore, the real party in interest is granted leave to ratify the commencement of this action within twenty-one days of the date of this order.

## CONCLUSION

For the reasons stated herein, Defendant's Motion to Dismiss is granted in part and denied

in part. If commencement of this action for breach of the sublease is not ratified by the real party

in interest within twenty-one days of the date of this order, Counts IV and V shall be dismissed.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: